1
2
3
4
5
6
7
8                     **UNITED STATES DISTRICT COURT**
9                    **CENTRAL DISTRICT OF CALIFORNIA**
10

NANCY DEVRIES,                      | CASE NO. SA CV 19-01499-DOC-DFM

        Plaintiff,

    vs.                             | **FINDINGS OF FACT, CONCLUSIONS
                                    | OF LAW, AND TRIAL ORDER**

AETNA LIFE INSURANCE COMPANY,

        Defendant.

## I.     INTRODUCTION

The parties filed Trial Briefs and Responses in this matter on February 26, 2020 and March 17, 2020, respectively. Due to the COVID-19 pandemic and the Central District of California's Continuity of Operations Plan, the Court vacated the bench trial scheduled for May 4, 2020 and invited the parties to submit supplemental briefing in lieu of oral argument. *See generally* Min. Order (Dkt. 34). The parties submitted Supplemental Trial Briefs on May 15, 2020. For convenience, the Court will refer to these documents as "Plaintiff's Brief" (Dkt. 24), "Plaintiff's Response" (Dkt. 27), "Plaintiff's Supplement" (Dkt. 36), "Defendant's Brief" (Dkt. 23), "Defendant's Response" (Dkt. 26), and "Defendant's Supplement" (Dkt. 35). References to the Administrative Record are denoted by numbered documents with the "AET STD" and "AET" prefixes (Dkt. 23-2, Ex. A and Ex. B, respectively).

This is a review, under the Employee Retirement Income Security Act ("ERISA"), of Defendant Aetna Life Insurance Company's ("Defendant") denial of Plaintiff Nancy DeVries's ("Plaintiff") claim for disability benefits.

The Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent that any findings of fact are included in the conclusions of law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the findings of fact section, they shall be deemed conclusions of law.

## II.     FINDINGS OF FACT

### A. Plaintiff's Employment and Insurance Plan

1.     Plaintiff worked for First American as a Senior Business Analyst until she stopped working on August 19, 2016. [AET 493; Pl.'s Br. at 2; Def.'s Br. at 3.]

2.     Defendant issued group policy number GP-800452 (the "Group Policy") to First American to fund long-term disability ("LTD") benefits under First American's welfare benefit plan (the "Plan"). [AET 601.]

3.    The Group Policy defines "Total Disability" as follows:

From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be totally disabled on any day if, as a result of a disease or **injury**, you are unable to perform with reasonable continuity the **substantial and material acts** necessary to pursue your **own occupation** and you are not working in your **own occupation**.

After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be totally disabled on any day if, as a result of a disease or **injury**, you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity that exists within any of the following locations:

- a reasonable distance or travel time from your residence in light of the commuting practices of your community; or
- a distance or travel time equivalent to the distance or travel time you traveled to work before becoming disabled; or
- the regional labor market, if you reside or resided prior to becoming disabled in a metropolitan area.

[AET 429.]

4.    The Group Policy defines "own occupation" as follows: "Any employment, business, trade or profession and the **substantial and material acts** of the occupation you were regularly performing for your employer when your period of disability began." The definition "is not necessarily limited to the specific job you performed for your employer." [AET 619.]

5.    A claim filed pursuant to the Group Policy "must give proof of the nature and extent

of the loss." Additionally, "Aetna may require copies of documents to support your claim, including data about any other income benefits. You must also provide Aetna with authorizations to allow it to investigate your claim and your eligibility for and the amount of other income benefits." [AET 615.]

**B. Plaintiff's Disability Claim**

6. On July 25, 2016, Plaintiff visited Dr. Rena Ahuja for "body aches; congestion; upset stomach; sinus headaches; fatigue & tired." Dr. Ahuja noted diagnoses of acute sinusitis, orthostatic hypotension, and fatigue. Dr. Ahuja ordered a number of lab tests. [AET STD 168-170.]

7. On August 25, 2016, Plaintiff made another visit to Dr. Ahuja, complaining of a "sinus infection." Plaintiff reported fatigue, weakness, nausea, change in stool consistency, and muscle pain, and noted that she "woke up wiped out," "couldn't get out of bed," "slept till 1 pm," and that this had happened multiple times during the year. Dr. Ahuja diagnosed Plaintiff with chronic sinusitis, fatigue, and gastroesophageal reflux disease. [AET STD 173-174.]

8. Plaintiff returned to Dr. Ahuja on September 6, 2016, reporting fatigue, weakness, sore throat, and swollen glands. Dr. Ahuja listed diagnoses of unspecified chronic fatigue, chronic fatigue syndrome, weakness, asthenia, osteopenia and other disorders of bone density and structure, and gastroesophageal reflux disease. [AET STD 165-166.]

9. Plaintiff next visited Dr. Ahuja on October 3, 2016, complaining of "fatigue, weakness, ach[es], [and] insomnia—getting better but still present." Dr. Ahuja listed diagnoses of insomnia, unspecified chronic fatigue, chronic fatigue syndrome, and gastroesophageal reflux. [AET STD 160-161.] Dr. Ahuja reiterated her chronic fatigue diagnoses and noted a possible Lyme disease diagnosis. [AET STD 165-165.]

10. On October 13, 2016, Plaintiff visited Dr. Ahuja again, reporting "extreme fatigue, weakness and mm [muscle?] ache and some swelling of the glands." Dr. Ahuja once

1   again listed diagnoses of chronic fatigue and Lyme disease. [AET STD 164.]

2   11.   Dr. Ahuja referred Plaintiff to Dr. Anjali Vora, who saw Plaintiff on November 10,

3         2016. Dr. Vora noted that Plaintiff's lab work indicated low levels of C3 and C4

4         (immune system proteins), a positive test for Immunoglobin M ("IgM", an antibody),

5         normal results for hormones, Vitamin D, thyroid, a normal or "[q]uestionable low"

6         level of cortisol (a hormone involved, inter alia, in the metabolic and immune

7         systems), and low levels of Ferritin (a blood protein that contains iron).

8         [AET STD 136-137.]

9   12.   On November 16, 2016, Plaintiff visited Dr. Ahuja. Dr. Ahuja listed diagnoses of

10        adrenal gland disorder, abnormalities of plasma proteins, low Ferritin level, and

11        osteopenia and other disorders of bone density and structure. Dr. Ahuja also noted

12        Plaintiff as having low FT3 (a thyroid hormone), low Ferritin 19, low C3 and C4, and

13        unopposed estrogen. [AET STD 171-172.]

14  13.   On November 21, 2016, Plaintiff had another appointment with Dr. Ahuja. Dr. Ahuja

15        listed diagnoses of fatigue and adrenal gland disorder, and again noted Plaintiff's low

16        levels of FT3, Ferritin 19, C3, and C4. [AET STD 118-120.]

17  14.   Plaintiff visited PA Alison Gracom on November 29, 2016. PA Gracom noted

18        Plaintiff's low levels of "Complement C3C and C4C . . . elevated estrone, low

19        testosterone, and low Free T3." She also noted that Plaintiff had tested positive for

20        Epstein-Barr Virus, and had taken "an adrenal saliva test that revealed very low

21        cortisol and also low DHEA [a hormone] levels." In PA Gracom's assessment,

22        Plaintiff was suffering from muscle weakness, menopausal or female climacteric

23        states, hypothyroidism, hypopituitarism, other adrenocortical insufficiency, iron

24        deficiency, osteoarthritis of the knee, allergic rhinitis, gastroesophageal reflux

25        disease, and dry eye syndrome. PA Gracom ordered a variety of additional lab tests.

26        [AET STD 90-92.]

27  15.   On November 30, 2016, Plaintiff visited Dr. Vora again. Dr. Vora noted lab results

28

with low levels of C3 and C4, and questionable low cortisol levels, possibly stemming from adrenal insufficiency. Dr. Vora noted that Plaintiff may have had acute Epstein-Barr Virus "a couple months ago when sick," and that Plaintiff's ongoing fatigue, muscle aches, and sleep disturbance were possibly due to endocrine issues. Dr. Vora also wrote that Plaintiff's positive Lyme disease test was a false positive. Dr. Vora referred Plaintiff to another doctor regarding her low C3 and C4 levels. [AET STD 132-133.]

16. Plaintiff visited Dr. Ahuja on December 6, 2016. Dr. Ahuja listed diagnoses of adrenal gland disorder, unspecified chronic fatigue, chronic fatigue syndrome, and defects in the complement system. Dr. Ahuja also listed Plaintiff's adrenal fatigue, low FT3, low Ferritin 19, and low C3 and C4. [AET STD 114-115.]

17. Also on December 6, 2016, Dr. Ahuja filled out Aetna's "Attending Provider Statement." Dr. Ahuja noted that Plaintiff "has fatigue, aches, & difficulty performing tasks at work." According to Dr. Ahuja, "[Plaintiff] cannot work for 8 consecutive hrs" and "[Plaintiff] has severe fatigue & has trouble working/sitting for prolonged periods." Dr. Ahuja explained that Plaintiff was seeing an endocrinologist, immunologist, and "various specialists" in her treatment plan, and that Dr. Ahuja expected that Plaintiff could likely see improvement in her condition by the end of December 2016 and a full recovery by mid-January 2017. [AET STD 196.]

18. On December 29, 2016, on a referral by Dr. Vora, Plaintiff visited Dr. Malika Gupta-Louis. While many of Dr. Gupta-Louis's findings were normal, Dr. Gupta-Louis listed as significant Plaintiff's levels of Immunoglobins G, M, and A. Dr. Gupta-Louis also noted Plaintiff's low levels of C3 and C4, and ordered further lab review. Dr. Gupta-Louis assessed Plaintiff as having recurrent infections, hypergammaglobulinemia, allergic rhinitis due to pollen, nasal congestion, and postnasal drip. [AET STD 124-127.]

19. On January 4, 2017, Plaintiff visited Dr. Ahuja for a complete physical examination

6

(i.e., a routine annual physical). During this visit, Dr. Ahuja recorded that Plaintiff "feels the same overall," "felt like immune system is not function [sic] well," "has IGG deficiency," "might need IGG infusions," and was seeing PA Gracom and an immunologist. Plaintiff's physical results were normal and Dr. Ahuja noted that Plaintiff does "core work / pilates every other day" for exercise. For diagnoses, Dr. Ahuja listed a "general adult medical examination without abnormal findings," selective immunoglobin G deficiency, unspecified adrenal gland disorder, unspecified chronic fatigue, low Ferritin level, and "[o]ther specified abnormalities of plasma proteins." Dr. Ahuja also noted Plaintiff's adrenal fatigue, low FT3, low Ferritin 19, low C3, low IgG, osteopenia, anxiety, and a rotator cuff tear. [AET STD 115-118.]

20.  On February 2, 2017, Plaintiff visited PA Gracom. PA Gracom assessed Plaintiff with unspecified immunodeficiency, other adrenocortical insufficiency, generalized muscle weakness, unspecified hypothyroidism, iron deficiency, osteoarthritis of the knee, unspecified allergic rhinitis, and gastroesophageal reflux disease. In her physical examination of Plaintiff, PA Gracom noted that Plaintiff had an abnormal result for 14 serotype Immunoglobin G, with an inadequate response to the Prevnar vaccine. She also described Plaintiff as "consistently tired, and weak." [AET STD 87-89.]

**C. Defendant's Review and Denial of Plaintiff's Claim**

21.  While pursuing the series of doctor visits listed above, Plaintiff called Defendant to start a claim for benefits on November 23, 2016. [AET STD 3.]

22.  On December 19, 2016, Defendant approved Plaintiff for short-term disability ("STD") benefits for the period running from August 26, 2016 through November 21, 2016. The approval was based on Plaintiff's fatigue, achiness, difficulty performing tasks, lab work results (such as IgM, white blood cell, and Ferritin levels), and medications (such as an IV drip and daily iron). Defendant noted that it would need

"latest evaluation from immunologist and ortho (Dr[.] Yim) for claim extension."
Defendant listed Plaintiff as having "No Current Work Capacity." [AET STD 2, 26,
71.]

23. In a letter dated January 4, 2017, Defendant informed Plaintiff that her STD benefits
were ending on December 29, 2016, and that Defendant was reviewing her claim for
LTD benefits. Defendant explained that "[t]he approval of your STD benefits doesn't
necessarily mean that you'll be approved for LTD benefits." [AET 117-118.]

24. On January 31, 2017, Defendant assigned Plaintiff's claim to LTD Benefit Manager
Therese Leimback. Ms. Leimback spoke with Plaintiff on the phone and took notes
on their call. Briefly stated, Ms. Leimback noted that Plaintiff felt increasingly run
down until she had no energy, at which point she went to see a doctor; that despite
her doctor visits, Plaintiff was not getting better; that Plaintiff's tests showed adrenal
fatigue and Lyme disease (the latter of which turned out to be a false positive); that
Plaintiff was continuing to see providers and considered PA Gracom to be her
primary treating provider; that Plaintiff could manage the tasks of "basic day to day
care and living but that is pretty much all she has the energy to do"; that Plaintiff
does "core work and pilates to maintain her back problems"—"[m]ainly stretching
exercises to keep her back from locking up"—"a couple times a week"; and that
Plaintiff was laid off after her position was eliminated. [AET 15.]

25. On February 7, 2017, Ms. Leimback referred Plaintiff's claim to Client Consultant
Tyler Thornton for a "[p]ending claim assessment of function and/or work capacity."
[AET 24.]

26. Mr. Thornton noted several of Plaintiff's lab results, such as low C3 and C4, and her
benign vital signs and physical examinations. Mr. Thornton also recorded Plaintiff's
IgG results as "benign" despite, e.g., Dr. Ahuja's findings of IgG deficiency. Mr.
Thornton returned the following assessment of Plaintiff's file: "There are no findings
demonstrating any other significant injury or illness pathology despite multiple

specialist examinations. The reported activity including . . . driving, daily walking and exertional exercise classes document activity well in excess of sedentary work requirements." [AET 29-30.]

27.  Ms. Leimback subsequently updated Plaintiff's file with her lab results from PA Gracom. [AET 37-45.]

28.  On March 3, 2017, Mr. Thornton conducted another review of Plaintiff's file. He noted that Plaintiff claimed that "provider notes that she does exercise and walking regularly are exaggerated and she does only minimal exercise in home and is not able to take walks . . . she does own cook/clean/ADLs [activities of daily living] and lives alone however reports fatigue is so severe some days she is not able to get up and around." In Mr. Thornton's assessment, Plaintiff's file made "no demonstration of acute or active illness. The reported abnormal immune globulin titer does not represent present illness of severity to preclude occupational tasks." Mr. Thornton did not change his prior determination. [AET 45-46.]

29.  In a letter dated March 9, 2017, Ms. Leimback informed Plaintiff that her LTD claim was denied "because the information we received isn't enough to show that you aren't able to work. . . . The records reviewed show no clinical findings showing injury or illness pathology despite multiple specialist examinations. The reported activity including activities of daily living, driving, daily walking and exertional exercise document activity well in excess of sedentary work requirements. . . . There was a report of abnormal labs but exam notes from Dr. Gracom demonstrate no acute or active illness to a severity that would prevent sedentary activity." Ms. Leimback explained that Defendant would

    review any additional information you care to submit, such as medical

    information from all physicians who have treated you for the

    condition(s), including but not limited to:

        • a detailed narrative report for the period August 19, 2016 through

present outlining the specific physical and/or mental limitations related to your condition that your doctor has placed on you as far as gainful activity is concerned; physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed;

- diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings;

- any information specific to the condition(s) related to your disability claim that would assist with the evaluation of your disability status; and

- any other information or documents that would assist us with the review of your claim.

The letter also explained how to appeal denial and the deadlines for doing so. [AET 504-506.]

**D.   Administrative Appeal of Plaintiff's Claim**

30.   On March 24, 2017, Plaintiff emailed Defendant to request all of her medical records and information for her STD and LTD claims. Defendant added a note about this email to Plaintiff's case notes. [AET 6.]

31.   In a letter dated March 30, 2017, Defendant informed Plaintiff that it was terminating her claim for STD benefits. The letter explained that "[y]ou may have impairment however clinical on file does not support impairment from performing sedentary physical demand level work." [AET STD 83.]

32.   In response to Defendant's denial, Dr. Ahuja wrote a letter to Defendant dated July 17, 2017. Dr. Ahuja explained that she had seen Plaintiff "multiple times for symptoms of extreme fatigue, starting July 25, 2016," and that Plaintiff's lab results "Revealed immunodeficiency as well as adrenal fatigue. Therefore, she is unable to function at a normal capacity that is required of her for an expected work day." Dr.

Ahuja also sought to "clarify incorrect references made in her medical history and clinical notes regarding her level of physical activity." Dr. Ahuja explained that the various references to "core work" and "Pilates" in Plaintiff's file were misleading. Although Dr. Ahuja "wanted [Plaintiff] to attempt to increase the intensity of her exercise to be at the level it was prior to the onset of her illness," Plaintiff's "exercise was not strenuous, but rather a low-intensity exercise such as stretching . . . the patient is actually doing Yoga-based and Pilates-based stretches as well as a self at-home exercise program to increase strength and vitality for her back pain and tightness. These are exercises of low-intensity." [AET 513.]

33.    PA Gracom sent Defendant a letter dated August 2, 2017. PA Gracom explained that, since she began seeing Plaintiff on November 29, 2016, Plaintiff's lab results "were positive for immunodeficiency and adrenal dysfunction. My diagnosis and observations also concluded that as a result of these medical issues, Ms. DeVries also exhibited symptoms of Chronic Fatigue Syndrome (formerly, Epstein Barr Virus)." PA Gracom also explained that she "began treatment of [Plaintiff's] condition with Immunoglobulin Therapy during the first week of April, 2017." PA Gracom attached to her letter confirmation of Plaintiff's lab results and verification of her immunoglobin treatments. [AET 516.]

34.    Plaintiff appealed her decision to Defendant in a letter dated August 3, 2017. Plaintiff recounted her history of doctor visits and lab results and argued that her diagnoses of immunodeficiency, antibody deficiency, and adrenal fatigue demonstrated her inability to work. Plaintiff attached several documents to her appeal letter, viz., Defendant's denial letter, Plaintiff's lab results, two articles on Specific Antibody Deficiency, Dr. Ahuja's July 17, 2017 letter, Plaintiff's CVS prescription for Hizentra (a medicine for immunodeficiency), PA Gracom's August 2, 2017 letter, and an article on immunodeficiency. [AET 495-526.]

35.    Defendant assigned Plaintiff's appeal to Disability Appeal Consultant Ana Molina.

Ms. Molina referred the case to Vocational Consultant Cathleen Crovo to determine the requirements of Plaintiff's occupation. In case notes dated August 30, 2017, Ms. Crovo determined that Plaintiff's occupation as a "Project Director" was classified as a sedentary physical occupation, which entailed "Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally. Mostly sitting, may involve standing or walking for brief periods of time. Plans, directs, and coordinates activities of project are accomplished within prescribed time frame and funding parameters." Ms. Crovo's report also listed various tasks required in Plaintiff's work. [AET 72-74.]

36. On September 14, 2017, Ms. Molina referred Plaintiff's file to PDA, an outside medical vendor, for an endocrinology peer review. After reviewing the notes of the office visits detailed above, Dr. Robert Cooper concluded as follows: "The symptoms/findings do not support an endocrine diagnosis behind the claimant's symptoms. There is no credible evidence to support ongoing impairment." Dr. Cooper highlighted two lab results (from November 29, 2016 and December 13, 2016) to conclude that Plaintiff had normal thyroid and adrenal gland function. Dr. Cooper attempted to contact Dr. Ahuja and PA Gracom, but was unable to do so. [AET 75, 468-473.]

37. On September 25 and 26, 2017, Defendant sent letters, with Dr. Cooper's report attached, to Dr. Ahuja and PA Gracom informing them of Dr. Cooper's findings. Defendant invited Dr. Ahuja and PA Gracom to respond: "If you disagree with the reviewer's conclusions, please respond by indicating which areas of the attached report you agree with, which areas you disagree with, and any clinical evidence or observations in support of your opinion that have not already been provided." [AET 176-177.]

38. On October 3, 2017, PA Gracom responded to Dr. Cooper's review. PA Gracom noted that Dr. Cooper "completely disregarded" Plaintiff's diagnosis with "Selective deficiency of Immunoglobulin G Subclasses," and explained that this diagnosis had

been confirmed by Patient's immunologist, Dr. Gupta-Louis. PA Gracom further argued that Dr. Cooper improperly dismissed Plaintiff's adrenal dysfunction. As PA Gracom explained, "[Plaintiff] had serial salivary cortisol levels on 10/21/16 which show below normal cortisol levels for all but the 8 AM cortisol as well as a low total cortisol load for the day. The 12/13/16 labs that Dr. Cooper references as a normal AM cortisol, did not in fact have a cortisol level on them. I am not sure what normal AM cortisol level he is referencing." Finally, PA Gracom highlighted Plaintiff's "low Free T3 level that was seen on 10/21/16, and remained low on subsequent testing . . . consistent with Euthyroid Sick Syndrome." [AET 466.]

39. On October 4, 2017, Dr. Ahuja responded to Dr. Cooper's report, in relevant part, as follows: "[Plaintiff] has an immune deficiency with an underlying endocrine disorder and is undergoing IVIG therapy. The reviewer must take into account her overall condition to assess this further. She is seeing PA Allison Gracom for treatment. [AET 465.]

40. On October 23, 2017, Dr. Cooper provided a follow-up report. In preparing the report, Dr. Cooper conferred with PA Gracom on October 18, 2017. According to Dr. Cooper's report, "Ms. Gracom stated that she agreed from that an endocrine perspective, there was no clear diagnosis leading to restrictions and limitations . . . . However, she stated the claimant had immunologic deficiency, which primarily was leading to restrictions and limitations from 08/19/2016 to 06/01/2017, at which time the immune deficiency improved after treatment with IVIG." Dr. Cooper concluded that, "[f]rom an endocrine perspective, there is no credible evidence to support ongoing impairment. . . . Ms. Gracom and Dr. Ahuja . . . suggest that immunologic deficiency is a co-morbid diagnosis leading to restrictions and limitations from 08/19/2016 to 06/01/2017. A diagnosis of immunologic deficiency is outside my realm of endocrine expertise." [AET 458-461.]

41. Ms. Molina referred Plaintiff's file to Reliable Review Services, which assigned the

review to Dr. J. Thaddaeus Abbott. Dr. Abbott reported that Plaintiff's "medical findings do suggest a mild defect in her immune system, but this would not explain the fatigue the claimant was reporting. Additionally, there was no history of recurrent infections, only one sinus infection documented, so it is unclear if this abnormal finding had any clinical significance." Dr. Abbott noted that Plaintiff consistently complained about fatigue throughout her course of treatment. Dr. Abbott concluded that Plaintiff's file did not support a finding of functional impairment, i.e., "limitations in walking, standing, lifting, sitting, driving, fine motor/gross hand movement, lifting arms above head, etc.," and that Plaintiff's subjective complaints were inconsistent with her level of activity and unsupported "by any examination and/or diagnostic findings." Dr. Abbott was unable to reach PA Gracom. [AET 450-457.]

42. In a letter dated December 7, 2017, Ms. Molina informed Plaintiff that Defendant had decided to uphold its denial of benefits and that the denial was final and not subject to further review. The letter explained that the decision was based on the lack of sufficient evidence of ongoing impairment and the finding of Plaintiff's "capacity to perform [her] own occupation, as a Senior Business Analyst, which is a sedentary physical demand level." [AET 186-188.]

**E. Plaintiff's Additional Documentation**

43. On April 2, 2019, Plaintiff provided information to Defendant about a private disability insurance policy she had with RiverSource Life Insurance Company ("RiverSource"), under which RiverSource has continued to find Plaintiff continuously disabled. Defendant declined to reconsider its decision in light of this new information, as Defendant's position is that the Administrative Record in this matter had long been closed by the time it received Plaintiff's April 2, 2019 submission. [Pl.'s Br. at 10-11; Def.'s Br. at 14.]

## II.     CONCLUSIONS OF LAW

### A. Legal Standard

44. "In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). In a "bench trial on the record," the reviewing court must "evaluate the persuasiveness of conflicting testimony" and make findings of fact to determine whether the plaintiff is disabled under the terms of the policy. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999). This review may "consist[] of no more than the trial judge rereading [the administrative record]." *Id.*

45. As the parties agree, the present review of Defendant's denial of ERISA benefits is de novo. Pl.'s Br. at 15; Def.'s Br. at 14; *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir. 2009).

46. It is a claimant's burden, under the Group Policy, to prove disability/disease and functional impairment resulting therefrom: "Your claim must give proof of the nature and extent of the loss. Aetna may require copies of documents to support your claim . . . . You must also provide Aetna with authorizations to allow it to investigate your claim and your eligibility for the amount of other income benefits. You must furnish such true and correct information as Aetna may reasonably request." AET 615; *see also Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172 (N.D. Cal. 2011) ("In an ERISA action, the plaintiff carries the burden of showing, by a preponderance of the evidence, that he was disabled under the terms of the Plan during the claim period.").

47. The Court notes that the Group Policy does not require "proof" to meet a specified degree of "objectivity" (such as numerical lab results), nor does it exclude the presentation and consideration of subjective evidence, such as reports of a claimant's symptoms. And as a general matter, the Ninth Circuit has held that a "lack of

objective physical findings" does not necessarily justify a denial of benefits; that is, a disability insurer [may not] condition coverage on proof by objective indicators such as blood tests where the condition is recognized yet no such proof is possible." *Salomaa*, 642 F.3d at 678.

**B.  De Novo Analysis of Plaintiff's Claim**

48.  The Court concludes, after reviewing the record de novo, that Plaintiff adequately proved both her disability and functional impairment under the "own occupation" of the Group Policy's definition of "Total Disability."

49.  During the first twenty-four months of disability, "total disability" obtains if a claimant, "as a result of a disease or **injury**, [is] unable to perform with reasonable continuity the **substantial and material acts** necessary to pursue [their] **own occupation** and [they] are not working in [their] **own occupation**." After twenty-four months, this definition changes to a more stringent "any occupation" standard, which need not be reproduced in full here. AET 429.

50.  In the denial letter dated December 7, 2017, Defendant explained to Plaintiff that it found no endocrinological basis for Plaintiff's "symptoms and complaints of fatigue and weakness," and that Plaintiff's "mild defect in [her] immune system . . . would not explain the fatigue [she was] reporting." Defendant found no evidence of medication side effects in the record "that would support cognitive/functional impairment" or interfere with Plaintiff's "activities of daily living." Defendant noted that Plaintiff's "complaints of fatigue and muscle aches . . . did not appear to rise to a level of impairment," and that there were not "physical examination findings or testing results to support ongoing impairment." Therefore, Defendant concluded "that you have had the capacity to perform your own occupation, as a Senior Business Analyst, which is a sedentary physical demand level." Defendant then quoted the U.S. Department of Labor's definition of sedentary work. AET 186-187.

51.  The relevant standard, however, is not whether a claimant is unable to perform a

sedentary occupation; it is whether a claimant can "perform with reasonable continuity the **substantial and material acts** necessary to pursue [the claimant's] **own occupation**." Substantial and material acts may *include* a level of physical activity, but there is no basis for interpreting substantial and material acts as defined by or limited to the physical activity level of an occupation. *See also Sabatino v. Liberty Life Assurance Co. of Bos.*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) ("Inability to perform sedentary work is not the definition of disability set forth in the policy. The relevant definition of disabled in the policy is 'unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness.'").

52. Under the proper standard—considering the substantial and material acts of Plaintiff's own occupation—Plaintiff demonstrated by a preponderance of the evidence her disability and functional impairment.

53. As for disability, the administrative record (summarized in the Findings of Fact above) is replete with evidence that Plaintiff suffers from a disability. Plaintiff submitted to Defendant numerous laboratory tests with abnormal results, and her attending physicians repeatedly noted these results and offered diagnoses of Plaintiff's condition. Of particular note are diagnoses of unspecified chronic fatigue and Chronic Fatigue Syndrome.

54. According to the U.S. Centers for Disease Control and Prevention ("CDC"): "Myalgic encephalomyelitis/chronic fatigue syndrome (ME/CFS) is a disabling and complex illness" which often prevents people from doing "their usual activities." The CDC notes that ME/CFS "changes people's ability to do daily tasks, like taking a shower or preparing a meal," and "often makes it hard to keep a job, go to school, and take part in family and social life. . . . Researchers have not yet found what causes ME/CFS, and there are no specific laboratory tests to diagnose ME/CFS directly. Therefore, doctors need to consider the diagnosis of ME/CFS based on in-depth

1    evaluation of a person's symptoms and medical history. It is also important that

2    doctors diagnose and treat any other conditions that can cause similar symptoms."

3    *Myalgic Encephalomyelitis/Chronic Fatigue Syndrome: What is ME/CFS*, CDC,

4    https://www.cdc.gov/me-cfs/about/index.html (last reviewed July 12, 2018).

5    55.   The CDC explains that "patients with ME/CFS could have illness resulting from

6    different causes . . . [and] it is possible that two or more triggers might work together

7    to cause the illness." The CDC lists five categories of possible causes: infections,

8    immune system changes, stress affecting body chemistry, changes in energy

9    production, and possible genetic link. Of particular relevance to the instant case are

10   (1) the fact that "about one in ten people who become infected with Epstein-Barr

11   virus . . . will develop a set of symptoms that meet the criteria for ME/CFS"; (2) the

12   possible link between T-cell irregularity and ME/CFS; and (3) the possible link

13   between endocrine glands (including the adrenal glands), the hormones they release

14   (including cortisol), and ME/CFS—although some ME/CFS patients "have lower

15   levels of cortisol than healthy people, but their cortisol levels are still within the

16   normal range"; thus, cortisol levels alone cannot be used "to diagnose or treat

17   ME/CFS." *Myalgic Encephalomyelitis/Chronic Fatigue Syndrome: Possible Causes*,

18   CDC, https://www.cdc.gov/me-cfs/about/possible-causes.html (last reviewed July 12,

19   2018).

20   56.   As the Ninth Circuit has previously held, "there are no objective tests for" Chronic

21   Fatigue Syndrome. *Salomaa*, 642 F.3d at 677. To be diagnosed with Chronic Fatigue

22   Syndrome,

23        a patient must meet the following two criteria:

24            •   The patient must have clinically evaluated, unexplained persistent

25                or relapsing chronic fatigue that is of new or definite onset (i.e.,

26                not lifelong), is not the result of ongoing exertion, is not

27                substantially alleviated by rest, and results in substantial reduction

28

in previous levels of occupational, educational, social, or personal activities.

- The patient must have concurrent occurrence of four or more of the following symptoms: substantial impairment in short-term memory or concentration; sore throat; tender lymph nodes; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern, or severity; unrefreshing sleep; and post-exertional malaise lasting more than 24 hours. These symptoms must have persisted or recurred during six or more consecutive months of illness and must not have predated the fatigue.

*Id.* (Defendant does not point to a different definition for unspecified chronic fatigue or Chronic Fatigue Syndrome in the Group Policy.)

57. Plaintiff has demonstrated by a preponderance of the evidence that she suffers from clinically evaluated, unexplained, and persistent chronic fatigue of new onset (as of approximately August 2016). *E.g.*, AET 455 (finding by Dr. Abbott that Plaintiff's complaints "were consistently noted throughout the course of treatment . . . [and] the complaints remain fatigue"). Additionally, Plaintiff has provided sufficient evidence of tender lymph nodes, *e.g.*, AET STD 90, 136; muscle pain, *e.g.*, AET STD 133, 137, 164; multi-joint pain, *e.g.*, AET STD 136, 164; unrefreshing sleep, *e.g.*, AET STD 136, 160-161; and post-exertional malaise, *e.g.*, AET STD 174, 196.

58. At the very least, then, the Administrative Record supports a finding that Plaintiff suffers from Chronic Fatigue Syndrome. Moreover, given the nature of this condition, the Court finds Plaintiff's attending physicians more reliable witnesses than Dr. Cooper and Dr. Abbott, whom Defendant hired to review Plaintiff's file. As noted above, to be properly diagnosed, Chronic Fatigue Syndrome requires careful examination of a patient's symptoms and medical history. Plaintiff's doctors—who interacted with and examined her over the course of numerous appointments—found

that she suffers from unspecified chronic fatigue or Chronic Fatigue Syndrome, and they were in a far better position to make such a determination than Dr. Cooper or Dr. Abbott, who had only documents available for review.

59.   As for functional impairment, Plaintiff has also proven that her disease or disability keeps her from performing the substantial and material acts necessary to her own occupation.

60.   First American, summarized the role of a Senior Business Analyst as follows: "Working with business departments, drive process improvement through seeking out and identifying opportunities and business process definition by defining and documenting processes and procedures. Assess and document training needs, communicate existence of new process. Document business processes, training procedures, standard operating procedures, project status, etc. Oversees projects for business departments and/or acts as a liaison/strategic partner between [First American] and government entities, vendors, corporations, and other [First American] divisions to define business processes and/or generate, update and create various products and services. When new processes are identified, may hand off to Project Management Team for implementation." AET 493.

61.   First American listed the "Essential Functions" of a Senior Business Analyst—i.e., "the primary responsibilities and duties of the job"—as follows:

- Identifies work flow and business process requirements and related solutions over a complete business process including obtaining approvals, documentation, testing and training.
- Conducts business process evaluations, interviewing internal and external customers, to gain technical knowledge of business requirements.
- Considers the business implications of work flow and processes to the current business environment.

- Identifies problems, researches alternatives, prepares presentations, drives solutions, tests to confirm, gains consensus, and implements solutions for multiple processes within multiple functions.
- Create reports; research and analyze data and report trends and vital information to management/business partner.

First American also noted that the role of Senior Business Analyst typically requires a B.S. degree or equivalent work experience, and "4-8 years of directly related experience." First American also expects a Senior Business Analyst to mentor and advise "less experience Business Analysts, monitoring project status," and to "use[] expertise of other Business Analysts and leverage[] a wide range of additional resources to define complex business processes crossing functional areas." AET 493.

62. Similarly, in Defendant's notes on Plaintiff's case, Ms. Crovo summarized Plaintiff's job as follows: "Plans, directs, and coordinates activities of designated project to ensure that goals or objectives of project are accomplished within prescribed time frame and funding parameters." Ms. Crovo also listed several tasks involved in Plaintiff's employment:

1. Reviews project proposal or plan to determine time frame, funding limitations, procedures for accomplishing project, staffing requirements, and allotment of available resources to various phases of project.
2. Establishes work plan and staffing for each for each phase of project, and arranges for recruitment or assignment of project personnel.
3. Confers with project staff to outline workplan and to assign duties, responsibilities, and scope of authority.

4.  Directs and coordinates activities of project personnel to ensure project progresses on schedule and within prescribed budget.

5.  Reviews status reports prepared by project personnel and modifies schedules or plans as required.

6.  Prepares project reports for management, client, or others.

7.  Confers with project personnel to provide technical advice and to resolve problems.

. . .

May Also Include:

1.  May coordinate project activities with activities of government regulatory or other governmental agencies.

AET 73-74.

63.  Plaintiff, meanwhile, consistently represented that she suffered from severe fatigue, sometimes to the degree that she was unable to get out of bed. It is obvious that her fatigue would impair her ability to carry out the wide array of analytical, strategic, and managerial tasks that were expected of her in the regular course of her own occupation as a Senior Business Analyst. Additionally, Dr. Ahuja represented that Plaintiff "is unable to function at a normal capacity that is required of her for an expected work day," AET 513, and explained that Plaintiff "has fatigue, achiness & difficulty performing tasks at work," that Plaintiff "cannot work for 8 consecutive hrs," and that Plaintiff "has severe fatigue & has trouble working/sitting for prolonged periods," AET STD 196.

64.  On the other hand, the Administrative Record also contains findings that Plaintiff is capable of carrying out a sedentary occupation. For example, in his review of the case, Mr. Thornton concluded as follows: "The reported activity including . . . driving, daily walking, and exertional exercise classes"—later clarified to be low-intensity stretching to help alleviate Plaintiff's back issues—"document activity well

in excess of sedentary work requirements." AET 29-30. Although Mr. Thornton later acknowledged that Plaintiff "does only minimal exercise in home and is not able to take walks . . . she does own cook/clean/ADLs [activities of daily living] and lives alone however reports fatigue is so severe some days she is not able to get up and around," this finding did not overturn his prior conclusion. AET 45-46. Similarly, Dr. Abbott found that Plaintiff's "complaints including fatigue and weakness are not consistent with her level of activity," and that her case file does not "support limitations in walking, standing, lifting, sitting, driving, fine motor/gross hand movement, lifting arms above head, etc." AET 456.

65.  These conclusions fail to apply the relevant standard—i.e., whether Plaintiff could carry out the substantial and material acts necessary to her own occupation. Given the job description and duties quoted at length above, it is obvious that the substantial and material acts of Plaintiff's job go far beyond the minimal physical labor involved in a sedentary occupation. Rather, Plaintiff's occupation required Plaintiff to carry out a variety of mentally taxing responsibilities, such as analyzing and researching work flow processes, creating and presenting reports, and coordinating with other personnel. If—as Mr. Thornton acknowledged in Defendant's own review—Plaintiff suffers from such severe fatigue that she sometimes cannot even manage the basic tasks of daily life, it is obvious that Plaintiff's fatigue would impair her ability to fulfill the intellectual and interpersonal rigors expected of a Senior Business Analyst, which far outstrip the demands of the activities of daily living.

66.  The Court therefore concludes, on the basis off the Administrative Record, that Plaintiff proved (1) that she suffers from a disease or disability, and (2) that her disease or disability functionally impairs her from carrying out the substantial and material acts necessary to pursue her own occupation. Defendant's determination to the contrary was erroneous.

### C. Extent of the Administrative Record

67. The Court takes no position as to whether Plaintiff's April 2, 2019 submission should be included in the Administrative Record, as the Court's findings of fact, conclusions of law, and judgment are based solely on those documents that the parties do not dispute are part of the Administrative Record.

68. The Court shall issue its judgment separately.

## III.   CONCLUSION

After considering the parties' arguments, for the reasons explained above, the Court **HOLDS** that Plaintiff shall be awarded past-due benefits, pre-judgment interest, attorneys' fees, and costs through the "own occupation" period under the Group Policy. The Court **REMANDS** the case to the administrator for further deliberation, consistent with this order and the requirements of ERISA, to determine Plaintiff's eligibility for further LTD benefits under the "any occupation" standard. The Parties shall submit a joint proposed judgment in accordance with this Court's ruling **on or before July 3, 2020.**

DATED:     June 16, 2020

_David O. Carter_

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE